IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| LAURALEE RICHMOND, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. 3:22-cv-282 |
| § | |
| TEAM ONE CONTRACT SERVICES, L.L.C. § | |
| d/b/a TEAMONE LOGISTICS, § | |
| § | |
| Defendant. § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Lauralee Richmond ("Ms. Richmond" or "Plaintiff") files this Original Complaint against Team One Contract Services, L.L.C. d/b/a TeamOne Logistics ("Defendant").

## SUMMARY

1. Ms. Richmond worked for Defendant as an Operations Manager.

2. Ms. Richmond was discriminated against on the basis of her pregnancy when her employment was terminated shortly after informing Defendant of her intent to take maternity leave.

3. Defendant's articulated reasons for Plaintiff's termination are pretextual.

4. Ms. Richmond was terminated in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

## THE PARTIES AND JURISDICTION

5. Plaintiff is a natural person residing within the confines of the Southern District of Texas, Galveston Division. Plaintiff has standing to file this lawsuit.

6. Defendant Team One Contract Services, L.L.C. is a Georgia limited liability company conducting business in the Southern District of Texas.

7. Defendant may be served with this Complaint through their registered agent, Business Filings Incorporated, at 701 Brazos Street, Suite 720, Austin, TX 78701.

8. The Court has subject matter jurisdiction over this case based on federal question jurisdiction under Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

9. Venue is appropriate in the Southern District of Texas, Galveston Division, because a substantial part of the events giving rise to the claims in this lawsuit occurred in this judicial district.

## FACTUAL BACKGROUND

10. On or around July 29, 2019, Ms. Richmond was hired as Operations Manager at Defendant's location in Freeport, Texas.

11. Defendant has a contract with UPS Logistics ("UPS") to provide dedicated fleet services in support of UPS' client, Chiquita Brands International, at its terminal in Freeport.

12. Vera Rhame-Wise, Defendant's previous Operations Manager at the Freeport terminal, provided Ms. Richmond with approximately nine days of training before her effective retirement.

13. In a conversation with Mark Messmer ("Mr. Messmer"), Defendant's Vice President of Human Resources, Ms. Richmond was told that both Mr. Messmer and Patsy White ("Ms. White"), Defendant's Safety and Compliance Director, would both fly out to the Freeport terminal within Ms. Richmond's first three months of employment to provide her with additional training on Defendant's safety procedures. The promised training trips never occurred.

14. Lacking much in the way of formal training, Ms. Richmond had to take the initiative in order to improve safety at the Freeport terminal. This facility had witnessed eleven

accidents in the year leading up to Ms. Richmond's hire and ranked last in safety nationally out of seventeen UPS terminals.

15. Thanks to policies and procedures that Ms. Richmond put in place, meticulous attention to detail, and hard work, the Freeport terminal saw systemic improvement from dead last to first place nationally in UPS's safety rankings, a lofty position that the Freeport terminal maintained for the last eleven months of Ms. Richmond's tenure with Defendant.

16. When Ms. Richmond started working for Defendant, monthly Comprehensive Health and Safety Process ("CHSP") meetings at the Freeport terminal were brief, ten or fifteen minute gatherings that only featured about five to eight of the drivers from the terminal. These meetings were primarily conducted to provide updates about driver concerns.

17. Under Ms. Richmond's management, she made every driver in the terminal a member of the CHSP committee to ensure that a culture of safety was established and actively promoted.

18. CHSP meetings were held on a monthly basis during Ms. Richmond's tenure. A monthly safety flyer was also distributed towards the end of Ms. Richmond's tenure.

19. Both Mr. Messmer and Ms. White were well aware of the changes Ms. Richmond had made as any changes to safety protocol had to be submitted in writing.

20. Ms. White herself attended two CHSP meetings at the Freeport terminal in person and flew out to the terminal on another occasion along with Defendant's Chief Operating Officer, Jeff Hudson ("Mr. Hudson"), to recognize the Freeport terminal's accomplishment in taking over the top ranking in UPS's national safety rankings. Mr. Hudson cooked steaks for the entire team to celebrate the achievement.

21. At the time of Mr. Hudson's visit, the Freeport terminal had achieved over 800,000 safe driving miles thanks in significant measure to Ms. Richmond's emphasis on improving safety procedures.

22. Mr. Messmer also knew about the safety meetings, as he received monthly expense reports from Ms. Richmond for food purchases totaling hundreds of dollars at each CHSP meeting.

23. In addition, Ms. Richmond participated in a weekly safety call with Ms. White, or one of her subordinates, and Bruce Pate ("Mr. Pate"), a fellow terminal manager, to discuss the monthly safety meetings and the issues that were being addressed.

24. Jennifer Zavala ("Ms. Zavala"), Defendant's dispatcher at the Freeport terminal, may not have known that the monthly safety meetings were formally known as CHSP meetings, but Ms. Zavala was nevertheless present for these meetings and typically sat right next to Ms. Richmond during them. Her desk was less than eight feet from Ms. Richmond's desk.

25. Although Ms. Zavala did not conduct driver safety observations personally, her name as dispatcher was included on the submitted forms upon the explicit instructions of Gerald Whisman ("Mr. Whisman"), Ms. Richmond's UPS Regional Manager. Ms. Richmond only submitted these weekly driver observation reports to UPS's Mr. Whisman.

26. While it was premised that both the terminal manager (Ms. Richmond) and terminal dispatcher (Ms. Zavala) would each contribute to the weekly driver safety observations, Ms. Zavala had no idea of how to do so properly, so in practice Ms. Richmond performed all of these observations.

27. When Ms. Richmond explained this to Mr. Whisman, he told her to leave the files alone that showed Ms. Zavala's participation in order to avoid disturbing UPS's internal metrics. Mr. Whisman himself flew in for three safety meetings, as well as being present on conference calls for additional meetings.

28. Not every driver could be present in person for the monthly CHSP meetings because invariably there were loads that needed to be delivered throughout the workday.

29. Ms. Richmond recalls that CHSP meetings were typically scheduled to fall on Fridays around lunch time to maximize in-person attendance, which was usually around 70% of terminal drivers.

30. If a driver was out on a load during a CHSP meeting, Ms. Richmond would catch up with them individually or in groups as they returned to the terminal later during that day or the following workday.

31. So long as she could meet with them to brief them on the material covered during the CHSP meeting, drivers would receive credit for attendance. If a driver was absent from a CHSP meeting altogether for legitimate reasons (vacation, illness, etc.), then attendance at the following month's meeting was compulsory and the driver would not be dispatched until he or she stopped by Ms. Richmond's desk to receive notes from the missed meeting.

32. Ms. Richmond specifically discussed these procedures with Ms. White and Mr. Hudson and no issues were raised concerning them.

33. Ms. Richmond typically only forwarded such routine safety documentation to UPS's Mr. Whisman and Defendant only took an interest in such documentation when Ms. Richmond expressed her firm intention to take a maternity leave.

34. Ms. Richmond first informed Defendant of her pregnancy in October of 2020 and asked them to begin planning for contingencies since she intended to take a post-partum leave. Defendant's leadership dismissed her concerns and informed her that the assumption was that she would simply begin working from home as quickly as possible after giving birth.

35. Suspiciously, in December 2020, Ms. Richmond received a write-up for unsatisfactory job performance, less than two months after she informed Defendant of her

pregnancy and less than one month after Mr. Hudson flew out to her terminal location to recognize Ms. Richmond's facility for their stellar safety performance.

36. On February 23, 2021, Ms. Richmond sent an email to Mr. Messmer, which constituted her fourth request for assistance in planning her maternity leave. Mr. Messmer neglected to respond to the email, but in a subsequent phone call explained to Ms. Richmond that any complaints she may have concerning her treatment by Defendant since informing them of her plan to take maternity leave were "ludicrous and not worthy of discussion."

37. In March 2021, Mr. Messmer told Ms. Richmond that he was on a random audit and that she was to produce forms reflecting driver observations. She did not use, and never had used, the audit forms Mr. Messmer was referencing. She instead produced her workbook with her driver observation notes.

38. Mr. Pate claimed that he had not seen or used the audit form in question in his fourteen years of experience as a terminal manager.

39. Mr. Messmer nevertheless insisted that Ms. Richmond was responsible for maintaining three years of audit forms and that she would have to turn in her keys because she was being terminated.

40. Mr. Whisman and others at UPS attempted to intervene on Ms. Richmond's behalf but to no avail.

41. On March 12, 2021, roughly two months before her scheduled due date, Ms. Richmond was informed of her termination for an alleged failure to maintain supporting documentation for driver observations. Defendant has since added the additional justifications that Ms. Richmond falsified safety records and failed to maintain supporting documentation of her safety meetings.

42. These allegations are not only false, but depict the exact opposite of the successful safety culture Ms. Richmond instilled at the Freeport terminal.

43. Approximately three weeks after Ms. Richmond's wrongful termination, UPS recognized the achievements of the Freeport terminal by awarding it the 2020 Operation of the Year for Group B (9-24 trucks).

44. Ms. Zavala replaced Ms. Richmond as Defendant's Operations Manager at the Freeport terminal.

45. Under Ms. Zavala's watch, the meticulous attention to safety that was a hallmark of Ms. Richmond's management tenure atrophied considerably. This culminated in the termination of Ms. Zavala and other of Defendant's employees at the Freeport terminal due to allegations that alcoholic beverages were being consumed on the job.

46. Ms. Richmond's termination was discriminatory pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

## TITLE VII CLAIM OF PREGNANCY DISCRIMINATION

47. Plaintiff incorporates the preceding paragraphs of this Complaint as if set forth verbatim.

48. Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

49. In 1978, the Pregnancy Discrimination Act amended Title VII to include discrimination on the basis of pregnancy, childbirth, or related medical conditions within the composition of unlawful sex discrimination.

50. Discrimination can be established through direct or circumstantial evidence. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

51. Where the plaintiff has not presented direct evidence of discrimination, courts apply the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the framework, to establish a *prima facie* case of discrimination, a plaintiff must show that: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was qualified for the job that was held; (3) the plaintiff was discharged; and (4) after the employer discharged the plaintiff, the employer filled the position with a person who is not a member of a protected group." *Black v. Pan Am. Labs., LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (quoting *Valdez v. San Antonio Chamber of Commerce*, 974 F.2d 592, 596 (5th Cir. 1992)). Alternatively, in the case of disparate treatment, the plaintiff may satisfy the last element by showing that others similarly situated were treated more favorably. *See Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

52. After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to show a legitimate, non-retaliatory reason for the adverse employment action. *Black*, 646 F.3d at 259; *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

53. The burden then shifts back to the plaintiff to show either: "(1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Black*, 646 F.3d at 259 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (alteration in original).

54. All conditions precedent to this suit have been fulfilled.

55. Plaintiff makes a *prima facie* case of discrimination. Plaintiff is a member of a protected group by virtue of her pregnancy; Plaintiff was qualified for the job that she held;

Plaintiff was terminated; and Plaintiff was treated objectively worse when compared to one or more similarly situated employees who were not pregnant.

56. More to the point, Plaintiff was terminated soon after expressing her intent to take maternity leave and shortly before she was set to commence maternity leave.

57. Plaintiffs who prevail in a Title VII discrimination claim are entitled to back pay. The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

58. Prevailing plaintiffs are also entitled to reinstatement as an equitable remedy. *See Julian v. City of Houston, Tex.*, 314 F.3d 721, 729 (5th Cir. 1992). If reinstatement is not feasible, front pay will be awarded in a manner consistent with the remedial purposes of the law. *See Brunnemann v. Terra Int'l Inc.*, 975 F.2d 175, 180 (5th Cir. 1992). Unlike back pay, front pay refers to future lost earnings. *See, e.g.*, *Jackson v. Host Intern., Inc.*, Nos. 09–51137, 10–50026, 2011 WL 2119644, at *8-9 (5th Cir. Feb. 1, 2011) (Fifth Circuit decision affirming front-pay award in a discrimination case); *Mota v. University of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 527 (5th Cir. 2001) (same).

59. Prevailing plaintiffs are entitled to compensatory and punitive damages under Title VII. *See* 42 U.S.C. § 1981A(a)(1).

60. Prevailing plaintiffs are also entitled to attorneys' fees and costs and Plaintiff seeks to recoup these amounts.

## JURY DEMAND

61. Plaintiff demands a jury trial.

## DAMAGES AND PRAYER

Plaintiff asks that she be awarded a judgment against Defendant for the following:

a. Actual damages in the amount of lost back pay, lost benefits, and other economic losses;

b. Reinstatement or front-pay;

c. Compensatory damages;

d. Punitive damages;

e. Prejudgment and post-judgment interest;

f. Court costs;

g. Attorney's fees; and

h. All other relief to which Plaintiff is justly entitled.

Respectfully submitted,

/s/ Ahad Khan
Ahad Khan
Texas Bar No. 24092624
S.D. Texas ID No. 2981398
712 Main Street, Suite 900
Houston, TX 77002
(713) 401-3558 – Telephone
ak@ahadkhanlaw.com – Email

ATTORNEY FOR PLAINTIFF
LAURALEE RICHMOND